Edwin D. TRAUTWEIN, Joan Trautwein, Plaintiffs,

v.

Gerald L. MILBACHLER, David H. Lambert, Stephen Simer, Greg Farris, Juan Rodriguez, Joseph F. Dolan, Defendants.

Civ. A. No. 79–W–1302.

United States District Court, D. Colorado.

Jan. 29, 1980.

Edwin D. Trautwein and Joan Trautwein, pro se.

Joseph F. Dolan, U. S. Atty. by Jerre W. Dixon and Donald M. Hoerl, Asst. U. S. Attys., Denver, Colo., Angelo Castelli, Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION

WINNER, Chief Judge.

Plaintiffs seek injunctive relief against defendants acting in their capacity as representatives of the Internal Revenue Service attempting to collect unpaid taxes admitted to be owed by plaintiffs. This opinion will serve as the findings of fact and conclusions of law required by Rule 52, F.R.C.P.

This case will not go down in history as illustrative of the Internal Revenue Service's finest hour. Some of the judgmental aspects of the case leave me incredulous, and from defendants' standpoint it is fortunate that principles of estoppel applied to businessmen can't be enforced against incomprehensible government conduct. Defendants should be equally delighted that the law does not require that their conduct be subjected to scrutiny as to reasonableness similar to that applied to just ordinary folk. However, the law is settled that where the interests of the fisc are involved, different rules apply, and I am bound by that law enacted by statute and judicial decision.

I shall not detail the evidence in the case, and I am content with a recitation of just a few highlights. Plaintiffs are reluctant taxpayers who have been active in futile tax protest movements. As will be explained before I am through, they seem to be dedicated to martyrdom, and their approach to their conflict with the I.R.S. has been demonstrated to be as stubborn and unyielding as is that of the I.R.S. However, that august body has all the presumptions favoring government going for it.

Plaintiff Edwin D. Trautwein is in the refrigeration repair business in Alamosa, Colorado, and he does not deny that he has been and is delinquent in his tax payments. He and his wife own a home in Alamosa, and the original loan on it was paid down to a relatively small balance. Not long ago, he placed a second mortgage on the home and, although the percentage of the proceeds of the loan paid over to the I.R.S. is in dispute, it is undenied that a very large part of the loan went to payment of his back taxes. Plaintiffs say they thought that they were out of the woods as to their disputes with the tax collectors, but they were wrong. The I.R.S. came back for more taxes, and, after some negotiation, plaintiffs thought that they had struck a bargain for installment payments. They signed a form providing for installment payments they could live with, and the agent signed the same form. Regrettably there was some fine print bringing to mind scads of cases decided in the insurance field, and cases dealing with mail order houses. The I.R.S. form is patterned on those shoddy commercial practices which hide in the fine print a provision that although the customer is stuck, the seller isn't bound until the deal is accepted by the home office. The I.R.S. printed form submitted and filled in by the agent and agreed to by plaintiffs in discussions between the agent and the harried taxpayer has small print in it which says that the taxpayer is bound, but the I.R.S. isn't until the agreement is approved by a superior located many miles away. Plaintiffs deny that this was ever explained to them, and I know not whether it was or wasn't, but the language is hidden there in the small print and even if it wasn't explained, the I.R.S. can fall back on it. Courts and legislatures have taken care of these practices where commercial salesmen are involved, but the I.R.S. is unfettered by any applicable law I am aware of including law of estoppel applied to most people. So, I have no way around reluctantly deciding that the "approval by the

home office" language in the I.R.S. form is enforceable. Plaintiffs said at the earlier hearings in this case that all they wanted was to hold the I.R.S. to the "agreement" plaintiffs thought had been entered into, but I can't enforce that which under its technical language wasn't a contract.

Rightfully or wrongfully I inquired into why "home office approval" wasn't given, and the startling explanation deserves to be memorialized in this opinion. The decision was founded on a misconception that plaintiffs could use the remaining equity in their home to easily raise the money to pay the additional few thousand of dollars of taxes which were being claimed. The home was by then subject to a first and second mortgage. The availability of funds was decided by the I.R.S. agent without benefit of an appraisal and the decision rested on an off-hand comment of a local employee of a mortgage company that he would think about making an additional loan. The I.R.S. regulations require that in deciding whether funds can be raised to pay taxes, "forced sale values" shall be taken into account in reaching the agency decision. The I.R.S. agent who testified was asked what "forced sale values" means, and he replied that this means cost less depreciation, a concept which I think would baffle a banker or an appraiser.

It was also argued that all the government plans to do is to sell the plaintiffs' home and that really doesn't matter much because plaintiffs can redeem. But their redemption rights exist for an unbelievably short period of time and the interest rate is shocking even in times of 15% prime rates. How they can redeem I have not the slightest notion, because the evidence convinces me that there is no possibility of obtaining either a third mortgage on the home or a refinanced second mortgage which will produce any money to pay the I.R.S. However, remembering testimony in unrelated cases concerning the devastating results of breaches of agreements to pay taxes into a trust fund, plaintiffs may be lucky their "offer" wasn't accepted.

There were other problems. Ordinarily real property must be auctioned off in the county where it is situate, but the District Director can order that the auction take place somewhere else. That was done here, and the sale was ordered to be held in Colorado Springs. The assigned reasons are that Colorado Springs will provide a better market and the angry tax protestors in Alamosa might make it dangerous to hold the sale there. The Director testified that these were the reasons for his considered decision. He is the one who is to make that decision and I can't overrule it, but I have trouble following this reasoning when the sale is to be by sealed bid.

Threading its way throughout the case is obvious anger on the part of I.R.S. agents stemming from their belief that someone shot a tire off an agent's car as he drove across La Veta Pass. If this happened, I don't blame the agents for being unhappy, but I heard no convincing evidence that any such remarkable shot was ever fired and I heard no evidence at all which even points toward probable cause to believe that these plaintiffs had anything to do with the incident if it occurred. Based on what I heard, it would have been impossible to persuade a magistrate to issue an arrest warrant against plaintiffs, but I fear that some of the judgments exercised in this case stem from the beliefs of the agents that plaintiffs were involved in this alleged shooting. The tax laws shouldn't be distorted to accomplish through them that which is not permitted under the more conventional procedures of the criminal law.

I have absolutely no sympathy for the so-called tax protestors and their methods. I think that they are misguided and that they are headed for jail because they rely on stupid advice handed out by non-lawyers, some of whom wind up controlling their student's assets. The record of tax protestors in this district is less than good, and juries have not hesitated to convict. Nevertheless, the tax protestors are entitled to due process of law and they are entitled to fair treatment. The record made in this case bothered me as hinting at possible oppression of such a grave nature that despite

the usual rules applicable to court interference with tax collections, some type of relief might be necessary and available if the facts were sufficiently egregious.

The problem was compounded by plaintiffs' financial inability to employ counsel and by that .which seemed to me to be less than full and wholehearted cooperation and understanding on the part of I.R.S. personnel and Department of Justice counsel. As I have had occasion to do before, I fell back on the Colorado Bar Association, and, acting in what I thought was the public interest, I asked the Tax Section of the. Colorado Bar to provide counsel, without expense to plaintiffs. A lawyer specializing in tax matters and. a lawyer specializing in real estate problems appeared and each gave generously of his time and advice. They briefed all questions presented, and they were unable to clear on direct attack the legal hurdles standing in plaintiffs' path.

■ The first hurdle was the Anti-Injunction Act, 26 U.S.C. § 7421(a) which is mighty clear:

". . . no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed."

*Enochs v. Williams Packing and Navigation Co.* (1962) 370 U.S.· 1, 82 S.Ct. 1125, 8 L.Ed.2d 292, delineates the only exception to the statute, and that exception doesn't fit the facts of this case. That exception is so narrow that plaintiffs would have to show that under the most liberal view of the law the government couldn't win and that irreparable harm would result. The government is pursuing the remedies given it by statute to collect taxes admitted to be owed, and the law doesn't permit me to second guess the tax collectors on judgmental matters. So, right at the start, I must conclude that Congress has said that I have no jurisdiction to grant plaintiffs the relief they ask.

There is no constitutional violation in pursuing the levy and sale procedures set up by Congress. *United States v. Smith,* 10 Cir., 484 F.2d 8. This attack by plaintiffs fails. Moreover, even if there were some way to enjoin the sale to permit plaintiffs even more time to raise the money to pay the taxes they admit they owe, there is no way to eliminate the requirements of Rule 65 as to bond. *Atomic Oil Co. v. Bardahl Oil Co.* (1969) 10 Cir., 419 F.2d 1097. If plaintiffs had the security to make bond, they could raise the money to pay the taxes because the conditions of the bond would be such that the surety would wind up liable for the taxes if plaintiffs didn't pay.

I have already commented on the installment payment question. Plaintiffs have no statutory right to pay in installments and, therefore, the I.R.S. can set up its installment procedures in any way it wishes. The reasoning underlying the thinking that plaintiffs can raise the money to pay the taxes eluded and it continues to elude me, but the fact that I think that decision rests on a false premise doesn't mean that I can do anything about it.

I thought long and hard about the possibility of applying rules applicable to adhesion contracts to this situation, but I can't. Every element of an adhesion contract is present if the installment "offer" were an installment "agreement," but I know of no way of twisting rules applicable to contracts to fit offers. I completely reject any suggestion by Department of Justice counsel that there is equality of bargaining power, and I completely reject the analysis used by government counsel to escape application of rules used in adhesion contract situations. If the "offer" didn't have the "home office approval" language in it which prevented it from becoming a contract, there might be an adhesion contract, but the government isn't bound by the mores of the market place, and there was no contract. Moreover, even if there were, adhesion principles would only let plaintiffs set it aside, and that isn't what they want.

The government has freely admitted that this sale was so casually handled that there was a material mistake in arithmetic prejudicial to plaintiffs made in computing the

minimum bid price, but, if our efforts have accomplished nothing else, now this arithmetic mistake has been corrected and no prejudice will result from it.

These, then, are some of the hurdles counsel serving without pay couldn't clear, but it is a tribute to their ingenuity and dedication that they found a probable way out for plaintiffs which would have let plaintiffs pay the taxes they admit owing over a longer period of time with a chance for a lower interest rate than that provided in the non-agreement they complain the I.R.S. won't go along with. Counsel discovered that the new Bankruptcy Law has provisions in it allowing a reorganization proceeding for someone in the Trautwein's shoes, and that a Bankruptcy Judge can be asked to approve a reorganization plan which will do everything and more plaintiffs thought they negotiated in their non-contract.

This delightful answer to plaintiffs' otherwise unsolvable problems was presented to them by counsel and it was rejected. At that point, counsel serving without pay asked to get out of the case and I quickly let them withdraw. As I said earlier, plaintiffs have an absolute right to be martyrs and they have a right to turn down a deal figured out for them by unpaid counsel—a deal which was better than the non-agreement they said they wanted enforced.

In recognition of that right to martyrdom, the request for a preliminary injunction is denied. In so ruling, I am not unaware that plaintiffs want a default judgment because defendants' brief was a little late. The motion for default is denied.

There is no reason for further briefing in this case and plaintiffs' motion for more time to file another brief is denied. The relief available under the reorganization provisions of the Bankruptcy Act can still be sought by plaintiffs, and the only court which can grant plaintiffs relief (if any) is the Bankruptcy Court. The Colorado Bar Association, as I have mentioned, has provided plaintiffs with the services of Stanley L. Drexler and Harry M. Williams, two of the most outstanding lawyers in the State of Colorado in their respective fields and plaintiffs have elected not to follow the advice given them. That election is one plaintiffs are privileged to make and they are going to have to live with the consequences.

I have no jurisdiction to enjoin collection of taxes by the I.R.S. I suppose plaintiffs can still seek reorganization under the protection of the Bankruptcy Court but time is growing short and volunteer counsel have withdrawn.